**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**
——————————————————————————

**UNITED STATES OF AMERICA**

        **v.**                                   **18-CR-167-RJA**

                                       **SENTENCING MEMORANDUM**

**BENJAMIN HANDLEY,**

                    **Defendant.**
——————————————————————————

## INTRODUCTION

I represent the defendant, Benjamin Asher Handley, in the above-captioned case. I submit this Memorandum in Aid of Sentencing in support of Mr. Handley's request for a sentence that is sufficient, but not greater than necessary to meet the basic goals of sentencing including retribution, deterrence, incapacitation, and rehabilitation. The following exhibits are attached hereto for the Court's consideration at sentencing:

| | |
|---|---|
| Exhibit A | Leah Handley – Mother |
| Exhibit B | Bob Handley - Father |
| Exhibit C | Catherine Handley – Sister |
| Exhibit D | Alicia Perkins – Aunt |
| Exhibit E | Avniel Camacho – Brother-in-Law |
| Exhibit F | Jon Erickson – Friend |
| Exhibit G | Judith James – Friend |
| Exhibit H | Angel Edmonds – Co-Worker |
| Exhibit I | Mark Robinson - Friend |
| Exhibit J | Joe & Clare Morrison – Friend |
| Exhibit K | Simeon Daigle - Friend |
| Exhibit L | Paula Gallagher - Friend |

| | |
|---|---|
| Exhibit M | Steven & Jenny Roth – Friend |
| Exhibit N | Shana Cardoza - Friend |
| Exhibit O | Cindy Cram - Friend |
| Exhibit P | Charles Green – Co-Worker |
| Exhibit Q | Logan Patrick – Co-Worker |
| Exhibit R | Marcia Lee – Co-Worker |
| Exhibit S | Mark Catlin – Co-Worker |
| Exhibit T | Olga Mametieff – Co-Worker |
| Exhibit U | Sharon Yvonne Vrla – Co-Worker |
| Exhibit V | Stephanie Rodriguez – Co-Worker |
| Exhibit W | Captain David W. Johnson – Co-Worker |
| Exhibit X | Anthony Resetarits – Community Member |
| Exhibit Y | Bill Fry – Community Member |
| Exhibit Z | William G. Roth – Community Member |
| Exhibit AA | Breanna Brizendine – Community Member |
| Exhibit BB | Charles Gaines – Community  Member |
| Exhibit CC | Charles Skeek – Community Member |
| Exhibit DD | Cody Gaines – Community Member |
| Exhibit EE | Danikt Kuzmin – Community Member |
| Exhibit FF | Dave & Eileen Becker - Community Member |
| Exhibit GG | Dennis & Jacquie Thaute – Community Member |
| Exhibit HH | Diana Jeska – Community Member |
| Exhibit II | Emil "Beaver" Nelson – Community Member |
| Exhibit JJ | Jane Wiehe – Community Member |
| Exhibit KK | Jo Going – Community Member |
| Exhibit LL | Jody Gaines – Community Member |
| Exhibit MM | Joshua Robert Bustard – Community Member |
| Exhibit NN | Keith L. Hedieger, D.C. – Community Member |

Exhibit OO      Kimberly Cooney – Community Member

Exhibit PP      Linda Murphy – Community Member

Exhibit QQ      Maria SantaLucia – Community Member/Neighbor

Exhibit RR      Micki Duncan – Community Member

Exhibit SS      Michael Loosli – Community Member

Exhibit TT      Morgan Edminster – Community Member

Exhibit UU      Pastor Lanny P. Simpson – Community Member

Exhibit VV      Patty Graham – Community Member

Exhibit WW   Phil Celtic – Community Member

Exhibit XX      Roberta Shakoori – Community Member

Exhibit YY      Verna Brizendine – Community Member

Exhibit  ZZ      Public Apology of Benjamin Handley to Homer News published
December 27, 2018

Mr. Handley is scheduled to be sentenced on November 14, 2019, at 2:30pm.

## PROCEDURAL HISTORY

On August 28, 2018, Benjamin was arrested in Alaska. On September 17, 2018, U.S

Magistrate Judge for the District of Alaska Deborah Smith ordered Benjamin's pre-trial release

on conditions which included that he remain within sight and sound of his mother, Leah

Handley, 24 hours a day.  Additionally, he was ordered not to use any electronic devices,

including computers or cell phones, his travel was restricted to Alaska and the Western District

of New York, and he was to pay for all travel to the Western District of New York.  Mr. Handley

subsequently appeared in the Western District of New York before the Honorable U.S.

Magistrate Judge H. Kenneth Schroeder Jr. on October 4, 2018 and was ordered released on the

same conditions.

Over the course of his pretrial release some of the release conditions have been lifted. On November 8, 2018, the conditions were modified to relieve the third-party custodian requirement and Benjamin was permitted to use a computer for the purpose of video-conferencing with counsel. On March 4, 2019, the conditions were again modified to permit his use of a computer for the purposes of his employment. Throughout Mr. Handley's period of pre-trial release he has been fully compliant with all conditions imposed.

On August 8, 2019, Mr. Handley appeared before this Court and pled guilty pursuant to a written plea agreement to Count 3 of the Indictment charging him with unlawful transport of a firearm in violation of 26 U.S.C. § 5861(j) which carries a statutory maximum sentence of ten years imprisonment.

The written plea agreement set forth the factual basis for the plea agreement and provided for a base offense level of 18. The parties agree that three additional enhancements apply: (1) a four level increase since the offense involved 8-24 firearms, namely 12, pursuant to USSG 2K2.1(b)(1)(B); (2) a four-level increase since the offense involved a firearm with an altered or obliterated serial number pursuant to USSG 2K2.1(b)(4)(B); and (3) a four level increase since the offense involved trafficking of firearms pursuant to USSG 2K2.1(b)(5). The parties disputed the application of an additional four-level enhancement for transferring a firearm with knowledge, intent or reason to believe that it would be transported outside the United States pursuant to USSG 2K2.1(b)(6)(A). The parties agree that the 2-level downward adjustment pursuant to Guideline §3E1.1(a) (acceptance of responsibility) and the additional 1-level downward adjustment pursuant to Guideline §3E1.1(b) apply. Under the defendant's calculations, the applicable guidelines range, given Mr. Handley's Criminal History Category of

I, was 70 to 87 months. Under the government's calculations the applicable guidelines range was 108 to 120 months.

Mr. Handley reserved his right to argue for a sentence outside of the applicable guideline range. The following is submitted to aid the Court in understanding that a sentence outside any applicable guidelines range is appropriate, and to assist the Court in determining what sentence is sufficient but not greater than necessary after consideration is given to all of the statutory sentencing factors which the Court may consider.

## SENTENCING PROCEDURE

While this Court must correctly calculate the Guidelines range in each case, it may not treat that range as mandatory. *Gall v. United States*, 552 U.S. 38, 49-51 (2007); *Nelson v. United States*, 555 U.S. 350, 352 (2009). Rather, this range is "one factor among several" to be considered in imposing an appropriate sentence under 18 U.S.C. § 3553(a). *Kimbrough v. United States*, 552 U.S. 85, 90 (2007). The Court must "consider all of the § 3553(a) factors," "make an individualized assessment based on the facts presented," and explain how the facts relate to the purposes of sentencing. *Gall,* 552 U.S. at 49-50, 53-60. The Court's "overarching" duty is to "'impose a sentence sufficient, but not greater than necessary' to accomplish the goals of sentencing." *Kimbrough,* 552 U.S. at 101; *see also United States v. Pepper*, __ U.S. __, 131 S. Ct. 1229, 1242-43-4 (2011). These goals are retribution, deterrence, incapacitation, and rehabilitation. 18 U.S.C. § 3553(a) (2).

The importance of individualized sentencing is a central theme in federal criminal law. As the Supreme Court recognized in *Koon v. United States*, 518 U.S. 81, 113 (1996), "[i]t has been uniform and constant in the federal judicial tradition for the sentencing judge to consider

every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, and sometimes magnify, the crime and the punishment to ensue." Having greater familiarity with an individual defendant places the sentencing court in a superior position to the Sentencing Commission "to find facts and judge their import under § [3553(a)] in each particular case." *Kimbrough v. United States*, 552 U.S. 85, 108 (2007) (internal quotations omitted).

Mr. Handley respectfully requests that this Court consider all of the factors in 18 U.S.C. §3553(a) under the circumstances of this case in imposing a sentence that is the least punitive and restrictive sentence the Court deems sufficient but not greater than necessary to meet the purposes of sentencing.

## ADVISORY GUIDELINES

As detailed in the written plea agreement, the parties disputed the application of a four level enhancement for transferring a firearm with knowledge, intent or reason to believe that the firearm would be transported outside the United States pursuant to USSG §2K2.1(b)(6)(A).

A Presentence Investigation Report, prepared in anticipation of sentencing on October 1, 2019, applied the four-level disputed enhancement, resulting in a sentencing range for imprisonment of 108 to 120 months. *See* PSR ¶¶ 46-58, 69. Mr. Handley has separately filed Objections to the PSR challenging this enhancement. *See* Document # 33.[1] If the Court fails to

---

[1] Mr. Handley also filed Supplemental Objections to the PSR, see Document No. 37, challenging his lone criminal history point. Resolution of this objection does not alter his Criminal History Category of I.

apply the disputed enhancement, the advisory guideline range is 70 to 87 months. Application of the enhancement increases the range to near the statutory maximum at 108 to 120 months.

## MR. HANDLEY'S HISTORY AND CHARACTERISTICS

Mr. Handley is a 26 year old man born and raised in Alaska. He resides with his parents and siblings in Homer, Alaska. The family is fully supportive of Benjamin and one or both of his parents have always travelled with him for his court proceedings in Buffalo.

Following his graduation from high school in 2011, Benjamin attended a missionary training for several months before leaving on an outreach mission to Rwanda. His sister reports that "he never asked if it was "safe" and put the needs of the Rwanda people over any logistical concerns for himself. (Exhibit C). While in Rwanda, Ben contracted a parasite which caused him digestive health issues upon his return. (PSR ¶89).

Ben returned to Alaska to pursue commercial fishing. He worked on fishing boats in "handshake kind of deal[s]" until he purchased a commercial fishing license from the State of Alaska. He did so by taking out a loan from the State of Alaska for the purchase of the license, and borrowing money from his parents for the down payment on the loan. His father withdrew money from his 401K to help with the purchase of the license. Benjamin attempted to fish salmon for three summers before concluding that his business was not destined to be successful. As he describes it, the salmon have migrated away from the location the license covers. He currently owes the State of Alaska $126,781.94 for the license and his parents $65,480.39. Despite the failure of the business, Benjamin has continued to make the annual payments to the State of Alaska and has been granted emergency transfers of the permit for the past few seasons.

*See* PSR ¶109-111.  Those lease agreements have permitted him to make the annual payments to Alaska.

After this failed fishing business, Benjamin worked at a fishing and marine supply store in Homer, Alaska from 2013 until 2017.  At the time of his arrest in this matter, he was working at Dresser Rand as a mechanic/millwright working on the "north slope."[2]  His arrest in this case and his conditions of release prevented him from returning to that work.

Since his release, Benjamin has worked various jobs at Home Run Oil Company.  The owner of Home Run Oil Company, Jon Erikson, speaks very highly of Ben's work ethic.  He explains that Ben's work attitude is always good, no matter the task. He states: "there are few young men that [he has] encountered that possess [Benjamin's] work ethic and character." (Exhibit F).

## ACCEPTANCE OF RESPONSIBILITY

Benjamin has readily accepted responsibility for his offense conduct.  He has never offered excuses for his behavior, rather he recognizes the poor decisions that he made leading to the charges, accepts that he alone is responsible for his behavior, and has made steps to demonstrate to his family, the Homer, Alaska community and the Court that he will not reoffend.

Homer, Alaska is a small tight-knit community, so when Benjamin was arrested on the present charges, everyone knew.  Benjamin felt shame that he brought such negativity to his

---

[2] Prudhoe Bay, often called the "north slope" is the largest oilfield in North America, measuring approximately 15 miles by 40 miles.  It is located in northern Alaska on the coast of the Arctic Ocean.  https://www.d.umn.edu/~cstroupe/archive/5230/glocal/prudhoe/ www.d.umn.edu/~hoef0049/prudhoe.html (last accessed October 31, 2019).

hometown and felt compelled to apologize. He wrote an article in the Homer News expressing his genuine remorse:

* * *

During this time of hardship, since my court case became public knowledge, the amount of support and love that I have received from the people of our town has been truly overwhelming. My heart has been humbled by all the good people that have shown me how they care. I never realized how much my life affects others until I saw all the people that I have disappointed. My spirit is grieved as I think of how my selfish ways have brought pain and disappointment to our community. While the deep callings of my heart are to serve and to help others, instead I have been living selfishly. Blinded by pride, I did not see the error of my ways. For this I am truly repentant. I regret the time that I have wasted.

After all the good that our community has done for me, you all deserve better than what I have given: disappointment and shame.

* * *

I stand among you today humbled, and determined to give goodness to others as I have so received goodness from you all.

(Exhibit ZZ).

Benjamin's insight into his poor decisions, the effect his decisions had on his community and his genuine remorse for his conduct are unique.

## BENJAMIN'S STRONG FAMILY AND COMMUNITY SUPPORT

The number of letters which have been submitted in support of Benjamin are, for the undersigned, unprecedented. A total of fifty-four (52) letters have been written on his behalf, and but for Benjamin's case taking place across the country from his home town, many expressed a desire to be present and show support for Benjamin in person.

By all accounts, Benjamin is a loved and well-respected member of his family and his community. In their letters, his relatives describe a very religious, moral, and generous

individual who was raised by a loving family in a stable home and who always helped everybody as much as he could.

His family deeply suffers from Benjamin's actions. His mother, Leah Handley, explains: "we have had to weather many family storms but this eclipses them all." (Exhibit A). Despite their pain, Benjamin's family members are looking forward to helping Benjamin build back his life as a hard-working community member. His aunt, Alicia Perkins, is convinced that Benjamin "is not violent and has many abilities and talents which can be used for good to lead to a productive benefit to his community." (Exhibit D).

Benjamin is praised by his relatives for how generous and helpful he is to every member of the Homer, Alaska community. His father, Bob Handley, indicates that Benjamin uses "any and all free time that he may have" for the aid of someone else in need. (Exhibit B).

Judith James, a family friend, recalls that when Benjamin witnessed how much Judith's mother was in pain due to her hip joint degeneration, he designed and fabricated a pivot device that allows her to move without twisting her leg. Judith observed that this device relieved her mother from a lot of pain. Judith is impressed by Benjamin's care, creativity, and thoughtfulness (Exhibit G).

Benjamin is very handy and put his skills toward helping the people he knows. He helped Patricia Graham with her gear shed (VV), Linda Murphy fixing her green house (Exhibit PP), and winterized Jane Wiebe's apartment (Exhibit JJ). Benjamin also stops each time somebody's car is stuck on the road (Exhibit C).

The volume of letters received from community members demonstrates that the Homer, Alaska community admires Benjamin's work ethic. The most powerful statement may be from Olga Mametieff, one of Benjamin's coworkers at the Kachemak Gear Shed. She explains that

she and Benjamin share strong religious beliefs, and praises him for helping her in her predominately male work environment (Exhibit T).

Paula Gallagher, Benjamin's current coworker, writes that Benjamin has a positive and genuine attitude and has made everybody's job easier (Exhibit L).

Benjamin is also praised for his moral ethic. His sister Catherine Handley recalls that eight years ago, Benjamin traveled to Rwanda on a mission trip. Upon his return, he suffered from amoebiasis, an infection contracted from a parasite found in contaminated food or water. Catherine is convinced that Benjamin, had he known what consequences his trip would have on his health, would have still accomplished his mission (Exhibit C). Joshua Robert Bustard, who went to the same mission trip as Benjamin, confirms this. Joshua recalls that Benjamin cared for the people in Rwanda and looked after the rest of the team members (Exhibit MM).

Angel Edmonds, one of Benjamin's friends who attends the same church as him, recalls one episode when a couple came to their church to talk about their involvement in fighting against human trafficking. After the talk, Benjamin immediately approached the speaker to find out how he could help the victims (Exhibit H).

Benjamin's family is very united and continues to support him. His brother-in law Avniel Camacho trusts Benjamin with babysitting his daughters. He is convinced that "their safety and well-being is [sic] never in question in the hands of [Benjamin]." He also indicated that "as a 12-year veteran in the military, if I had [Benjamin] watching my back and protecting me in a fire fight, I would have no concerns." (Exhibit E).

His sister Catherine Handley drove five hours with her children to visit Benjamin in prison on her birthday, (Exhibit C) and his mother, Leah, shared that "many men in this town have told me they wish their sons were more like [Benjamin]." (Exhibit A). This sentiment is

confirmed by Stephanie Rodriguez, who thinks Benjamin is a good role model for her own 14-year-old son (Exhibit V).

## POST-OFFENSE REHABILITATION

Benjamin's loved ones have witnessed his rehabilitative efforts following this offense. Benjamin is a faithful young man and this faith has helped him to accept responsibility for his conduct. His aunt Alicia Perkins wrote that Benjamin "has renewed his commitment to his faith." (Exhibit D). His father confirms Ben's faith; he explains that Benjamin studies his Bible as never before (Exhibit B). Judith James, a family friend, explains that when she and Benjamin talk about his situation, Benjamin does not express anger or bitterness but rather "the recognition that he must face the future and a confidence that God will see him through." (Exhibit G).

Benjamin's parents are the first to observe the very positive change in his character. His father, Bob Handley, shares that "[he has] never seen a more complete amendment of behavior, attitude, and consistently positive disposition than that which has been genuinely demonstrated by [Benjamin] on these many weeks since his release back into [his] house following the period of confinement in the Anchorage detention facility in September." (Exhibit B). His mother, Leah Handley, considers that Benjamin's arrest had proved to be a pivotal juncture in his life. She explains that Benjamin has always been very helpful and considerate to others but would show some attitude towards his parents, criticize their choices. Now, she observes that Benjamin demonstrates on a daily basis his respect for their authority as his paretns and his gratitude for their love. He does not swear nor consume alcohol anymore and jumps in when his parents need help. She describes Benjamin as "a very different person inside. Broken, humbled, remorseful." (Exhibit A). Judith James describes that his "youthful self-confidence is gone, replaced by humble calm." (Exhibit G). Simon Daigle, a commercial fisherman who talked on numerous

occasions with Benjamin about his offense, thinks that Benjamin responded with humility and seeks in every way to learn from poor choices. Simeon considers that "the seriousness of things has sobered him greatly and [he does] not believe [Benjamin] would make this type of choice again." (Exhibit K).

Paula Gallagher, Benjamin's current coworker, thinks that "this experience and the impending doom hanging over his head has made him ponder his life and purpose here." (Exhibit L). Benjamin speaks often about how sorry he is and how he must strive to make better decisions in the future for his life, no matter what happens next. He also shared with Paula how guilty he feels for having hurt his parents so greatly with his actions. (Exhibit L).

Benjamin works hard to reconcile with his community and heal the pain he caused. His sister Catherine Handley sees him "become even more devoted to relationships, commitments, virtue and reconciliation. He seems to stretch the hours of the day, working a full shift, calls to dear friends, cleaning a local church all before he comes home and checks to see how everyone's day at home was, always with a joyful heart." (Exhibit C). Steven and Jenny Roth, who are commercial fishermen who used to work with Benjamin, believe that "rarely will a young man make such bad decisions leading to the charges presented to him that will actually own their behavior and sincerely accomplish all changes necessary to clear his name and transform his reputation into a contrite and law abiding citizen." (Exhibit M). They think Benjamin is "setting a great example of having strayed and now changing-admitting- and willing to make amends to others for letting the community down in his law breaking." (Exhibit M).

Mark Robinson, the choral director of Homer High School, went to visit Benjamin after his release. He wrote: "I approached this visit with a dose of healthy skepticism about what [Benjamin] might say…I must say I came away very impressed by [Benjamin's] genuine

remorse, self-reflection and sense of responsibility. In no way did [Benjamin] try to blame others, the 'system', or circumstances…he took full responsibility and demonstrated remarkable maturity and honesty." Mark Robinson believes that Benjamin "is a perfect example of someone who needs a second chance." (Exhibit I).

These positive comments and support, not just from his family, but for such a significant number of community members demonstrate that Benjamin has made significant steps toward rehabilitation. His actions demonstrate his sincere remorse and personal commitment to lead a law abiding life. He asks this Court to consider a sentence outside of the guideline range in light of his lack of a significant criminal history, his strong family and community support, and his personal efforts at rehabilitation.

## V.    CONCLUSION

Based on the foregoing, Mr. Handley respectfully requests that this Court sentence him to a sentence that is sufficient but not greater than necessary to achieve the goals of sentencing recognizing that he has already begun his efforts at leading a law-abiding life.


**DATED:**  Buffalo, New York, November 1, 2019.

Respectfully submitted,

**/s/MaryBeth Covert**
MaryBeth Covert
Assistant Federal Public Defender
Federal Public Defender's Office
300 Pearl Street, Suite 200
Buffalo, New York   14202
(716) 551-3341; fax 551-3346
marybeth_covert@fd.org
*Counsel for Defendant Benjamin Handley*

**TO:**    Timothy C.  Lynch
          Assistant United States Attorney

          Matthew Zenger
          United States Probation Officer